**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DERRICK OVERTON** | **CIVIL ACTION** |
| **VERSUS** | **No. 18-6338** |
| **M/V ALTRO DONNA, LLC ET AL.** | **SECTION I** |

## ORDER & REASONS

Before the Court is defendants and third-party defendants', the M/V TOMORROW, Hawk Marine Corporation S.A., Marine Ace Co., Ltd., and Japan Ship Owners' Mutual Protection and Indemnity Association (together, "the TOMORROW entities"), motion[1] for summary judgment. Plaintiff Derrick Overton ("Overton") filed an opposition[2] to the motion, to which the TOMORROW entities filed a reply.[3] For the following reasons, the motion is granted.

### I.

The undisputed facts are as follows: Overton was a longshoreman working for Ports America, LLC ("Ports America").[4] Ports America was the stevedore handling the discharge of the TOMORROW's cargo from June 28, 2017 through June 30, 2017.[5]

---

[1] R. Doc. No. 53.
[2] R. Doc. No. 67.
[3] R. Doc. No. 71.
[4] R. Doc. No. 53-2, ¶ 4; R. Doc. No. 67-1, ¶ 4.
[5] R. Doc. No. 53-2, at ¶ 6; R. Doc. No. 67-1, at ¶ 6.

On or about June 27, 2017, the M/V TOMORROW (the "TOMORROW") docked at the Nashville Avenue Wharf for the unloading of its cargo of steel plates and coils.[6] Discharge operations as to the TOMORROW began at 0700 hours on June 28, 2017.[7]

On or about June 29, 2017, Barge IN096065 (the "barge") was moored alongside the TOMORROW to further Ports America's discharge operation.[8] The Ports America foreman decided where the barge would be moored alongside the TOMORROW and where the cables and lines would run.[9] A tugboat crew, unidentified by the parties, tied one end of the mooring lines to the barge, and the Ports America crew tied the other end of the mooring lines to the TOMORROW.[10] All lines, cables, and shackles used by the Ports America longshoremen to tie the barge to the TOMORROW belonged to Ports America.[11] Furthermore, the barge was tied to the TOMORROW by the tugboat's crew and Ports America's longshoremen; the TOMORROW's crew was not involved in securing the barge to the TOMORROW.[12]

Overton was responsible for the "vessel end" of the barge mooring line; the line was secured to two cables that were shackled together and such cables ran transversely on the deck from the port side edge of the TOMORROW to a stanchion next to the port coaming of one of the cargo holds.[13] The Ports America longshoremen

---

[6] R. Doc. No. 53-2, ¶ 5; R. Doc. No. 67-1, ¶ 5.
[7] R. Doc. No. 53-1, at 2 (citing R. Doc. No. 53-5).
[8] R. Doc. No. 53-2, ¶ 8; R. Doc. No. 67-1, at ¶ 8.
[9] R. Doc. No. 53-2, at ¶ 9; R. Doc. No. 67-1, at ¶ 9.
[10] R. Doc. No. 53-2, at ¶ 10; R. Doc. No. 67-1, ¶ 10; *see also* R. Doc. No. 53-6, at 47–50.
[11] R. Doc. No. 53-2, at ¶ 11; R. Doc. No. 67-1, at ¶ 11.
[12] R. Doc. No. 53-2, at ¶ 12; R. Doc. No. 67-1, ¶ 12.
[13] R. Doc. No. 53-2, at ¶ 14; R. Doc. No. 67-1, at ¶ 14.

assembled the lines and cables, laid them on the deck of the TOMORROW, and placed yellow caution tape on the deck along the cables from the TOMORROW's port side edge to the cargo hold area.[14] The cables and lines were clearly visible on the TOMORROW's deck, and Ports America longshoremen had utilized this line-and-cable setup on other vessels for prior jobs.[15]

The TOMORROW's crew had no involvement in assembling the lines or cables or laying them on the deck.[16] Furthermore, the TOMORROW's crew was not involved in monitoring the cargo as it was discharged; Overton's instructions came from his foreman.[17]

The alleged incident occurred on June 30, 2017.[18] That morning, Overton operated the forklift on the barge until cargo operations were complete. He then returned to the deck of the TOMORROW to wait for the M/V ALTRO DONNA (the "ALTRO DONNA"), a tugboat, to arrive and remove the barge.[19] Before they began the discharge operations on the TOMORROW, Ports America Superintendent Connor

---

[14] R. Doc. No. 53-2, at ¶¶ 15–16; R. Doc. No. 67-1, at ¶¶ 15–16.
[15] R. Doc. No. 53-2, at ¶¶ 18–19; R. Doc. No. 67-1, at ¶¶ 18–19.
[16] R. Doc. No. 53-2, at ¶ 17; R. Doc. No. 67-1, at ¶ 17.
[17] R. Doc. No. 53-2, at ¶ 20; R. Doc. No. 67-1, at ¶ 20.
[18] R. Doc. No. 53-2, at ¶ 13; R. Doc. No. 67-1, at ¶ 13.
[19] R. Doc. No. 53-2, at ¶ 21; R. Doc. No 67-1, at ¶ 21. The M/V ALTRO DONNA and M/V ALTRO DONNA, LLC (together, "ALTRO DONNA") are defendants and third-party plaintiffs in the above-captioned matter and have asserted claims for contribution against the TOMORROW entities. R. Doc. No. 19. During a May 1, 2019 telephone conference, counsel for ALTRO DONNA confirmed that they do not oppose the TOMORROW entities' motion for summary judgment. R. Doc. No. 72. Furthermore, ALTRO DONNA agreed that if the Court grants summary judgment in favor of the TOMORROW entities, ALTRO DONNA does not have a claim for contribution from the TOMORROW entities. *Id.*

Graham (the "superintendent") led a safety meeting for the Ports America longshoremen.[20] During the safety meeting, the superintendent discussed being careful with the lines across the deck and other trip hazards.[21]

When the ALTRO DONNA arrived, and before the alleged accident, Overton was standing at the rail on the deck of the TOMORROW with the cable laying along the deck to his left.[22] Overton was aware of the cable.[23] Overton alleges that the ALTRO DONNA pushed the barge upriver, causing the cable next to Overton on the TOMORROW's deck to also move upriver.[24] The cable then struck the outside of Overton's left ankle, knocking him down; Overton suffered a fracture of both ankles.[25] The cable that struck Overton belonged to Ports America, and the cable which struck Overton's ankle was the only thing that caused his fall.[26]

The alleged dangerous condition—the lines and cables across the deck—was created by the longshoremen after the TOMORROW entities turned the vessel over for discharge.[27] During cargo operations, Overton did not communicate with

---

[20] R. Doc. No. 53-2, at ¶ 7; R. Doc. No. 67-1, at ¶ 7.
[21] R. Doc. No. 53-1, at 4.
[22] R. Doc. No. 53-2, at ¶ 22; R. Doc. No. 67-1, at ¶ 22; R. Doc. No. 53-6, at 52 (deposition of Derrick Overton, p. 163:6–21).
[23] R. Doc. No. 53-2, at ¶¶ 22–23; R. Doc. No. 67-1, at ¶¶ 22–23.
[24] R. Doc. No. 53-2, at ¶ 25; R. Doc. No. 67-1, at ¶ 25. Overton testified that the ALTRO DONNA backed off the barge but then went forward, "bumping" the barge before all of the lines were untied. R. Doc. No. 53-1, at 4; R. Doc. No. 53-6, at 57–58 (deposition of Derrick Overton, pp. 168:1–170:1).
[25] R. Doc. No. 53-2, at ¶ 25; R. Doc. No. 67-1, at ¶ 25.
[26] R. Doc. No. 53-2, at ¶ 27; R. Doc. No. 67-1, at ¶ 27.
[27] R. Doc. No. 53-2, at ¶ 28; R. Doc. No. 67-1, at ¶ 28.

TOMORROW crewmembers, ask for anything from TOMORROW crewmembers, or notify TOMORROW crewmembers of his accident.[28]

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the Court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

---

[28] R. Doc. No. 53-2, at ¶ 29; R. Doc. No. 67-1, at ¶ 29.

5

A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

"[A] district court has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991). "[W]here 'the evidentiary facts are not disputed, a court in a nonjury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions.'" *Id.* (quoting *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978)); *see also Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017).

## III.

Overton has asserted a claim of vessel negligence against the TOMORROW entities.[29] Pursuant to the Longshore Harbor Workers Compensation Act, 33 U.S.C. § 905(b), a "worker may pursue a tort action against the owner of a vessel for acts of negligence." *Wilcox v. Max Welders, LLC*, No. 12-2389, 2014 WL 585603, at *2 (E.D. La. Feb. 13, 2014) (Africk, J.) (quoting *Levene v. Pintail Enters., Inc.*, 943 F.2d 528, 531 (5th Cir. 1991)). However, "Section 905(b) makes clear that the vessel owner may not be sued when the injury was caused by the negligence of those performing stevedoring services." *Id.* (citing 33 U.S.C. § 905(b); *Levene*, 943 F.2d at 532).[30] "[T]he primary responsibility for longshoremen's safety rests with the stevedore." *Id.* (citing *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007)).

---

[29] R. Doc. No. 29, at 3 ¶ IX.
[30] The limited nature of the vessel negligence action is especially clear in situations when the vessel owner is also the employer. "The Fifth Circuit has explained the danger of blurring the distinction between negligent acts committed as a vessel owner and negligent acts committed as a stevedore employer:

> [T]he stevedore's knowledge of dangerous conditions that may have arisen during the cargo operations should not be imputed to the shipowner, nor should the shipowner be deemed to know that the stevedore's actions in dealing with such dangers are obviously improvident. To impute this knowledge to a shipowner-employer would be to hold it liable in tort for damages arising from its negligence as stevedore, and effectively to eliminate the exclusivity provisions of sections 905(a) & (b)."

*Wilcox*, 2014 WL 585603, at *3 (quoting *Castorina v. Lykes Bros. S.S. Co., Inc.*, 758 F.2d 1025, 1033 (5th Cir. 1985))

A vessel owner may be held liable to longshoremen injured during stevedoring operations in only three circumstances:

> 1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known;
>
> 2) for injury caused by hazards under the control of the ship; and
>
> 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

*Robinson*, 505 F.3d at 365 (citing *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 15 (5th Cir. 1992)). The above-mentioned duties, known as *Scindia* duties, were defined by the United States Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). The only *Scindia* duty at issue here is the third duty—the duty to intervene.[31]

"The duty to intervene is narrowly construed and requires more than mere knowledge of a dangerous condition." *Blanchard v. Weeks Marine, Inc.*, No. 13-5089, 2014 WL 1414640, at *7 (E.D. La. Apr. 11, 2014) (Africk, J.) (citing *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997); *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)).

> To impose a duty to intervene on the shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arise during and in the area of

---

[31] At a March 19, 2019 status conference, the parties agreed that the duty to intervene was the only *Scindia* duty at issue. *See* R. Doc. No. 51. Furthermore, Overton has not argued in his response memorandum that any other duty is at issue.

> the stevedore's operations, something more is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it.

*Blanchard*, 2014 WL 1414640, at *7 (quoting *Singleton*, 79 F.3d at 28 (quoting *Futo v. Lykes Bros. Steamship Co.*, 742 F.2d 209, 215 (5th Cir. 1984))).

The Fifth Circuit in *Williams v. M/V Sonora* noted that "cases are unanimous in stating that knowledge alone is not enough," and "[t]he 'something more' requirement provides a useful and helpful threshold below which owners are not liable." 985 F.2d 808, 815 (5th Cir. 1993).

> *Scindia*, therefore, requires the existence of two basic conditions for the imposition of the shipowner's duty to intervene—the shipowner's actual knowledge of a danger to a longshoreman, and the shipowner's knowledge that the longshoreman employer is not acting reasonably to protect its employees from that danger.

*Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985); *see also Blanchard*, 2014 WL 1414640, at *7.

> The *Futo* court outlined considerations that pertain to the existence of these basic conditions: [1] whether the danger was open and obvious; [2] whether the danger was located within the ship or the ship's gear; [3] which party created the danger or used the defective item and was therefore in a better position to correct it; [4] which party owned and controlled the defective item; [5] whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and [6] whether the shipowner assumed any duty with regard to the dangerous item.

*Blanchard*, 2014 WL 1414640, at *7 (quoting *Casaceli*, 774 F.2d at 1328).

"A plaintiff must show 'something more' when a contractor['s] employees create 'open and obvious' hazardous conditions in an area or with equipment under their

9

exclusive control." *Landry v. G.C. Constructors*, 514 F. App'x 432, 437 (5th Cir. 2013) (quoting *Futo*, 742 F.2d at 215). "This is because '[t]he shipowner defers to the qualification of the stevedoring contractor in the selection and use of equipment and relies on the competency of the stevedore company.'" *Greenwood*, 111 F.3d at 1249 (quoting *Scindia*, 451 U.S. at 172) (internal quotation marked omitted). And "[i]n order for the expert stevedore's judgment to appear 'obviously improvident,' plaintiff must demonstrate that a condition exists that is so hazardous that anyone could tell that continued operations 'create[ ] an unreasonable risk of harm even when the stevedore's expertise is taken into account.'" *Blanchard*, 2014 WL 1414640, at *7 (quoting *Greenwood*, 111 F.3d at 1249).

"A shipowner, thus, has no duty to supervise or inspect a contractor's work to discover dangerous conditions that may develop during the course of its operations." *Gonzales v. United States*, 588 F. Supp. 2d 747, 763 (S.D. Tex. 2008) (citing *Scindia*, 451 U.S. at 172 ("[T]he shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.")). "The vessel may not be held to a duty to discover the condition or to anticipate its danger." *Id.* (citing *Helaire v. Mobil Oil. Co.*, 709 F.2d 1031, 1038–39 (5th Cir. 1983)). "A plaintiff's duty to intervene claim, thus, cannot rely on a theory that the vessel should have supervised, inspected or monitored a contractor's work." *Id.* at 763 n.3. (citations omitted).

The TOMORROW entities assert that they did not have a duty to intervene because (1) the lines and cables running on the deck and securing the barge to the TOMORROW did not constitute a dangerous condition;[32] (2) even if there was an unreasonably dangerous condition, it was not created by the TOMORROW's crew or its equipment;[33] (3) there is no evidence that the TOMORROW's crew had actual knowledge of an alleged unreasonable dangerous condition;[34] and (4) there is no evidence that the TOMORROW's crew had actual knowledge that Ports America was acting in an "obviously improvident" manner by exposing Overton to an alleged hazard.[35]

Overton does not dispute that he knew the cable was next to him on the deck of the TOMORROW; that the shackles, lines, and cables were Ports America's equipment; that Ports America created the setup of the lines and cables; and that the TOMORROW's crew had no involvement in assembling the lines or cables or laying them on the deck.[36] Furthermore, Overton makes no allegation that Ports America exercised "obviously improvident" judgment.[37]

Rather, Overton argues that the TOMORROW's crew should have had knowledge of the alleged dangerous condition.[38] However, Overton has not provided

---

[32] R. Doc. No. 53-1, at 9.
[33] *Id.* at 10.
[34] *Id.* at 11–12.
[35] *Id.* at 12.
[36] R. Doc. No. 67-1, at ¶¶ 11–12, 15–20.
[37] In fact, it is uncontested that the procedure Ports America utilized on the day of the incident had been utilized by Ports America on prior occasions. *Id.* at ¶ 19.
[38] R. Doc. No. 67, at 3.

any evidence that the TOMORROW's crew had actual knowledge of the alleged dangerous condition—an essential element of the duty to intervene. The TOMORROW entities have consistently denied that the TOMORROW's crew had any actual knowledge of a dangerous condition.[39]

Overton argues in his response that the TOMORROW entities' denial that the crew inspected the TOMORROW or its moorings "amounts to an attempt to deny that it knew the [ALTRO DONNA] would be so reckless in the way it picked up the [b]arge."[40] Overton argues that if the TOMORROW did not inspect the deck and the moorings, and it was not aware of the moorings, it "act[ed] below the standard of care required of the vessel in its duty to intervene," and that the "vessel cannot simply close its eyes to such obvious danger and then claim that it is not responsible for it because it lacked actual knowledge."[41]

Overton has failed to provide the Court with caselaw supporting its position that the TOMORROW crew had a duty to inspect the moorings installed by the stevedore or to supervise the stevedore or the tug's operations. In fact, the law is clear that "[o]nce stevedoring operations have begun, the owner has no duty to supervise or inspect the work and must only take care to prevent unreasonable hazards." *Levene*, 943 F.2d at 533. "Even then, the vessel owner must only intervene

---

[39] R. Doc. No. 53-1, at 12; R. Doc. No. 67, at 3 (citing R. Doc. No. 67-4, at 3–4).
[40] R. Doc. No. 67, at 3. During a May 1, 2019 telephone conference with the Court and the parties, Overton clarified that he does not allege that the TOMORROW entities violated the *Scindia* duty to intervene with respect to the ALTRO DONNA. R. Doc. No. 72.
[41] *Id.* at 3.

12

after stevedoring operations have begun if "it acquires actual knowledge that a condition on the vessel or its equipment poses an unreasonable risk of harm *and* if the vessel owner acquires knowledge that the stevedore is not exercising reasonable care to protect its employees." *Id.*

The Court finds that the TOMORROW entities have met their summary judgment burden and demonstrated that Overton has not raised a genuine issue of material fact with respect to the TOMORROW's alleged duty to intervene under these circumstances. Overton has also not set forth any evidence demonstrating a genuine issue of material fact as to the TOMORROW's duty to intervene.

The only evidence that Overton has provided are interrogatories wherein the TOMORROW entities deny that the TOMORROW had a duty to supervise or inspect stevedoring activities[42] and deposition testimony from ALTRO DONNA crewmembers that allegedly establishes safety violations present on the day of the incident. Such evidence, however, does not demonstrate that the TOMORROW had actual knowledge of a dangerous condition. Overton has also not provided any evidence that the TOMORROW had knowledge that Ports America exercised obviously improvident judgment during its stevedoring activities.[43]

---

[42] R. Doc. No. 67-4, at 3.
[43] Overton asserts that he has not yet been able to complete the deposition of the Master of the TOMORROW or been able to depose TOMORROW crewmembers. The deposition of the Master of the TOMORROW was not completed due to technical difficulties. R. Doc. No. 67, at 3. The TOMORROW entities assert that the deposition of the Master was rescheduled, but it has since been cancelled "due to lack of interest from the noticing parties." R. Doc. No. 71, at 3. Overton requests the opportunity to fully respond to the TOMORROW entities' motion for summary judgment after depositions of the Master and other crewmembers, R. Doc. No. 67, at 4.

# IV.

For the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED** and that all claims asserted by Overton against the TOMORROW entities are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the M/V ALTRO DONNA and M/V ALTRO DONNA, LLC's third party claims against the TOMORROW entities are **DISMISSED WITH PREJUDICE**.

---

Overton has failed to show "by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition," pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. However, the Fifth Circuit has "recognized that a nonmovant's 'failure to tailor its request for additional discovery to fit [the rule's] precise measurements does not necessarily foreclose the court's consideration of the request.'" *Meadows v. Latshaw Drilling Co., L.L.C.*, 866 F.3d 307, 313–14 (5th Cir. 2017) (quoting *Int'l Shortstop, Inc. v. Rally's Inc.*, 393 F.2d 1257, 1266 (5th Cir. 1991)). Nevertheless, the Fifth Circuit requires, at a minimum, that the nonmovant "indicate to the court by some statement, preferably in writing[,] . . . why he needs additional discovery and how the additional discovery will create a genuine issue of material fact." *Id.* (quoting *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993)).

Even assuming that Overton's statement at the end of his response to the motion is a sufficient request for more discovery under Rule 56, Overton has not indicated why he needs the additional discovery and how that discovery would create a genuine issue of material fact.

14

**IT IS FURTHER ORDERED** that the TOMORROW entities' counterclaim and crossclaim[44] against the M/V ALTRO DONNA and M/V ALTRO DONNA, LLC are **DISMISSED WITH PREJUDICE**.[45]

New Orleans, Louisiana, May 2, 2019.

                                                                    _____
                                                                    **LANCE M. AFRICK**
                                                                    **UNITED STATES DISTRICT JUDGE**

---

[44] R. Doc. No. 22.
[45] Counsel for the TOMORROW entities confirmed that they did not object to the dismissal of their counterclaim and crossclaim against the M/V ALTRO DONNA and M/V ALTRO DONNA, LLC.